# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| SENIJADA NISIC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 4:20-cv-1202-MTS |
| | ) | |
| KILOLO KIJAKAZI, *Acting Commissioner of* | ) | |
| *the Social Security Administration*,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of the final decision of Defendant, the Acting Commissioner of Social Security, denying the application of Senijada Nisic ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434 (the "Act").

## I.    Procedural History

On August 21, 2018, Plaintiff filed an application for DIB under the Act with an alleged onset date of January 31, 2017.  (Tr. 130–37).  After Plaintiff's application was denied on initial consideration, he requested a hearing from an Administrative Law Judge ("ALJ").  (Tr. 62–66, 70–71).  Plaintiff and his counsel appeared for an in-person hearing before the ALJ on October 9, 2019.  (Tr. 28–52).  In a decision dated December 26, 2019, the ALJ concluded Plaintiff was not disabled under the Act.  (Tr. 8–26).  The Appeals Council denied Plaintiff's request for review on July 7, 2020.  (Tr. 1–4).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the proper defendant in this suit and no further action need be taken pursuant to § 205(g) of the Act.

II.   **Evidence Before The ALJ**

   **A.  Overview and Hearing Testimony**

   Plaintiff was born in Bosnia on August 1, 1973 and was 44 years old when her insured status expired.  (Tr. 32).  Plaintiff lived in Bosnia during the war and reported seeing terrible things.  In 1998, Plaintiff moved to the United States.  (Tr. 284).  Plaintiff's highest level of education is eighth grade and she is able to communicate in English.  (Tr. 32, 21).  Plaintiff has past work as a cleaner, an assembly worker, and a home healthcare worker.  (Tr. 158, 188, 34–37).  She is married with three children.  (Tr. 40–41).

   Plaintiff appeared and testified before the ALJ on October 9, 2019.  (Tr. 27–52).  Plaintiff explained she was disabled due to a combination of issues with her arms, neck, and legs.  Plaintiff also stated mental impairments caused her to feel anxious and scared, that she is unable to control her emotions, that she had crying spells every day, and that she was unable to leave her home.  Plaintiff stated she was getting worse every day and was unable to take care of her children.  She explained that her husband was a trucker and home usually just one day a week, which left her with responsibility over the home and her children most of the time.

   Plaintiff testified that she sometimes went grocery shopping and attended school events, but most of the time she would stay inside the house "laying down".  (Tr. 39–40).  Sometimes she would do housework and chores, like washing dishes.  Plaintiff testified that she could only occasionally do housework because she would lose focus and lacked the strength.  Plaintiff testified to weakness and pain in her upper and lower extremities that caused issues such as difficulty holding items and standing for extended periods.  Plaintiff reported she was fired from her job as a home healthcare worker because she was "not mentally able anymore."  (Tr. 36–37).

### B. Medical Evidence

The relevant time period for consideration of Plaintiff's claim is from January 31, 2017, the alleged onset date, until March 31, 2018, the date her insured status expired. This point is not contested. Plaintiff initially applied for disability due to depression, anxiety, pain in her arms, and back and knee problems. (Tr. 157). At that time, Plaintiff was taking duloxetine for Post Traumatic Stress Disorder ("PTSD"), Lexapro for anxiety, mirtazapine for PTSD, Neurontin for radiculopathy, and ranitidine hydrochloride for epigastric pain. (Tr. 159).

#### 1. *Physical Impairments*

Plaintiff has a history of carpal tunnel release, with surgery reported in 2008. (Tr. 233, 313, 391). After complaining of knee pain for two years, (Tr. 208), a 2016 MRI confirmed a Baker's cyst in Plaintiff's right knee but otherwise was "normal" with no tears and full range of motion. (Tr. 205–06). Plaintiff stated Advil helped with pain.

In February 2017, Plaintiff complained of muscle joint aches and back pain to Dr. Payal Patel, her primary care provider. (Tr. 347, 349). Plaintiff reported her pain improved with massages and ibuprofen; she requested refills. Dr. Patel noted intact range of motion and strength and observed a normal gait and no problem bending. In October 2017, Plaintiff reported back pain and Dr. Patel's exam was still "normal." (Tr. 340-44). In March 2018, Plaintiff's neck, musculoskeletal, and neurological examinations were normal. (Tr. 325). Dr. Patel noted no musculoskeletal symptoms, no muscle aches, and no neurological symptoms. (Tr. 324). A March 2018 x-ray of Plaintiff's shoulder was normal. (Tr. 313).

The remaining medical evidence documents events and visits *after* the expiration of Plaintiff's insured status. On April 16, 2018, Plaintiff returned to Dr. Patel for increasing shoulder pain and reported numbness and tingling in both hands, but worse in right. (Tr. 313). Plaintiff

reported wearing shin splits and going to physical therapy for carpal tunnel, but that it now seemed to be returning on the right.  Dr. Patel noted a ganglion cyst at the dorsum of Plaintiff's right hand.  Further examination showed no muscle wasting and intact finger, wrist, and elbow range of motion of the right hand.  (Tr. 316).  The examination of Plaintiff's neck and shoulder showed normal range of motion, although Plaintiff reported pain with range of motion.  Dr. Patel also noted no notable deficit at bilateral hips, knees, or ankles and normal gait.

On April 30, 2018, Plaintiff saw an orthopedist for right upper extremity pain with numbness and tingling over the past year.  (Tr. 230).  An examination showed positive Spurling's, Hawkins, Tinel's and Phalen's on the right and tenderness in the anterior cervical triangles.  (Tr. 232-33).  An x-ray showed cervical hypomobility with bending.  (Tr. 408).  On May 1, 2018, an electromyography ("EMG") showed mild carpal tunnel syndrome ("carpal tunnel") on the right and no abnormalities to support cervical radiculopathy.  (Tr. 229–30).  On May 22, 2018, Plaintiff reported neck and right arm pain for the last year, which worsened in the last two to three months.  (Tr. 408).  The physician examination showed full upper extremity strength and full right shoulder range of motion with pain.  Later that month, Plaintiff reported tingling and pain in her right arm and shoulder.  (Tr. 307).  Dr. Patel's exam was normal, showing normal range of motion of all extremities, no deficits, and normal gait.  (Tr. 310).  Similarly, in July 2018, Dr. Patel observed normal range of motion of all extremities with no deficits and no joint pains, swelling, nor muscle aches.  (Tr. 300).

A September 2018 cervical MRI showed minimal cervical degenerative disc disease with mild bilateral facet arthropathy and mild left uncovertebral joint disease at multiple levels.  (Tr. 392).  In October 2018, Plaintiff reported neck and arm pain, weakness, and numbness.  (Tr. 391-92).  The physician examined Plaintiff and observed normal range of motion in the cervical spine

4

and range of motion with the shoulder did not exacerbate Plaintiff's symptoms.  The provider also noted Plaintiff had normal motor strength throughout her upper extremities and her Hoffman sign was negative, as were her Spurling's and Romberg's tests.  Plaintiff reported no difficulties buttoning buttons or picking up small objects such as coins.  The provider indicated that no surgical intervention was needed.  (Tr. 393).

On December 3, 2018, Dr. Patel examined Plaintiff and noted her overall findings were normal and observed normal range of motion of all extremities with palpable tenderness in her shoulders and fingers, which Plaintiff reported felt better with massage.  (Tr. 500).  The next day, an orthopedic doctor noted limited range of motion of the shoulders, 4/5 strength on the left with positive subscap test with pain bilaterally, positive empty can test, positive infraspinatus test with weakness on the right and bilateral upper trapezius and infraspinatus scapular protraction.  (Tr. 394).  The doctor recommended physical therapy, a steroid shot if her symptoms did not improve, and continued anti-inflammatory and gabapentin medication.  (Tr. 395).

From January 2019 until March 2019 Plaintiff went to physical therapy.  (Tr. 425–58).  A January 2019 physical therapy evaluation revealed decreased strength in nearly all upper extremity and muscles tested ranging from 3/5 and only one at 5/5.  (Tr. 427).  In March 2019, upon discharge, the evaluation revealed improved cervical and bilateral shoulder mobility and fair progression toward pain-free active mobility.  (Tr. 453).  On March 4, 2019, Plaintiff continued to report chronic back pain for three days at a time, which resolved with Advil or massages.  (Tr. 478, 484).  Dr. Patel examined Plaintiff and noted a normal exam.  (Tr. 482).

**2.  *Mental Impairments***

During the relevant period, Dr. Patel noted Plaintiff's recurrent major depression was "mild" and her examinations showed normal mood and appropriate behavior in December 2016

and February 2017.  (Tr. 350-52, 358-59).  During this time, Plaintiff reported depression was "not an issue for her" and declined mental health referrals.  She also stated she was "doing mentally well," (Tr. 351), and denied feeling anxious.  February 2017 PHQ-9 testing showed a score of 0 and the result showed that activities of "daily living [were] not difficult at all for [Plaintiff] due to the depression symptoms."  (Tr. 349).  Plaintiff's answers reported no sleep disturbances and no feelings of hopelessness or feeling down or depressed.

In October 2017, Plaintiff reported anxiety and stress.  (Tr. 340).  Dr. Patel prescribed Lexapro, recommended a follow up in two to six weeks, and referred Plaintiff to therapy.  (Tr. 344).  In November 2017, Dr. Patel observed Plaintiff and noted no psychological symptoms, euthymic mood, no sleep complaints, and normal enjoyment of activities.  (Tr. 336).

At a mental health assessment in December 2017, Plaintiff reported bouts of emotional instability and inability to care for herself or family due to her impaired mental health.  (Tr. 245).  December 2017 PHQ-9 testing showed a score of 23 and a GAD score of 20.  (Tr. 250).  The provider observed Plaintiff had a flat affect and low energy, but her mood was normal; her speech was appropriate; she was well groomed; her thought process and thought content were appropriate; her attitude was pleasant; and she had no perceptual disturbances. (Tr. 248–50).  Plaintiff was diagnosed with major depressive disorder and generalized anxiety disorder and referred to ongoing therapy sessions.  (Tr. 351).

In March 2018, Plaintiff reported more anxiety than depression and told Dr. Patel that her medications were helping, though not completely.  (Tr. 322).  Dr. Patel noted a normal mental examination and observed euthymic mood and normal affect and appearance.  (Tr. 325).  Dr. Patel stated Plaintiff's depression was "stable" and that she had "more anxiety than depression."  She

increased Plaintiff's Lexapro dosage, scheduled a follow-up for June, and recommended continuing with therapy.  (Tr. 326).

The remaining medical evidence documents events and visits *after* the expiration of Plaintiff's insured status.  In May 2018, Plaintiff stated that the last six months of mental health therapy was not working and requested to see a psychiatrist.  (Tr. 307).  Dr. Patel recommended Plaintiff remain on Lexapro for anxiety and hydroxyzine for anxiety and insomnia.  (Tr. 309).

On June 4, 2018, Plaintiff established care with a psychiatrist, Dr. Jaron Asher.  (Tr. 303). Plaintiff reported poor functioning and energy; lack of interest; difficulty sleeping; intrusive memories; no hallucinations or suicidal ideations; sad and anxious mood; poor appetite and concentration.  (Tr. 304).  Dr. Asher examined Plaintiff and observed sad affect and tears when talking about trauma, well-groomed, goal-directed, and fair eye contact, insight, and judgement. (Tr. 305).  Dr. Asher diagnosed Plaintiff with PTSD and adjusted medications for PTSD, depressed mood, anxiety, and insomnia.  (Tr. 306).

In July 2018, Plaintiff returned from Bosnia and reported that the trip made things worse. (Tr. 294).  She reported continued sleeping problems, symptoms of depression, preferring to be alone, lack of energy, and poor sleep and concentration.   Dr. Asher examined Plaintiff and observed sad affect with tears, well-groomed, alert and oriented, normal speech, goal-directed, and fair eye contact.  (Tr. 295).  Dr. Asher adjusted Plaintiff's medications and suggested she return in four to six weeks. (Tr. 295–96).

During an August 2018 mental health assessment, Plaintiff reported depressive symptoms, particularly since she came back from Bosnia, including phobias, hallucinations, and difficulties doing quick tasks.  (Tr. 238).  The provider observed flat energy level; tearful affect and sad; depressed and irritable mood; no suicidal ideations; normal speech and motor activity; appropriate

thought process and content, with some guilt and obsessions; well-groomed; and pleasant and cooperative. (Tr. 238, 240). PHQ-9 testing revealed a score of 15 and the GAD-7 score was 13. Diagnoses included moderately severe major depressive disorder and moderate generalized anxiety disorder. (Tr. 241).

At her next follow up with Dr. Asher on August 27, 2018, Plaintiff reported low mood, daily crying, preferring to be alone, easily distracted from tasks, feeling tired all the time, but able to get her kids ready for school in the morning and prepare dinner. (Tr. 283–84). Dr. Asher observed Plaintiff was dressed appropriately and well-groomed; had sad affect with tears; was goal-directed with normal speech; maintained fair eye contact; and was alert and oriented.

At her next follow up with Dr. Asher in October 2018, Plaintiff reported she was more often in a bad mood than a good one, did not feel like doing anything, and could not stand people. (Tr. 509). Her sleep was variable—when she is nervous, she cannot fall asleep and felt itchy like ants were crawling on her. Dr. Asher observed Plaintiff was appropriately dressed and well-groomed; had down affect but no tears; had goal-directed thoughts about "doing a tiny bit better"; maintained fair eye contact; and was alert and oriented. (Tr. 510). Dr. Asher recommended Plaintiff return in three to four weeks and increase her medications for continued depression, depressed mood, anxiety, PTSD, and insomnia. (Tr. 511). At her November 2018 follow up with Dr. Asher, Plaintiff reported improvement in her sleep and mood since the new medication and continued therapy. (Tr. 505). Dr. Asher observed Plaintiff's affect "did not seem down anymore" and noted improvement with medication and therapy. (Tr. 506). He recommended Plaintiff return in eight weeks and continue therapy and medications. (Tr. 507).

At her next follow up with Dr. Asher in January 2019, Plaintiff reported better sleep and fewer nightmares but overall felt worse than the last visit. (Tr. 492–93). He recommended

Plaintiff return in six weeks and continue therapy and medications with some increases.  (Tr. 494).  At her February 2019 follow up with Dr. Asher, Plaintiff reported better mood, fewer anxiety attacks, feeling more relaxed, and improved sleep with fewer nightmares.  (Tr. 488–89).  Plaintiff also reported improved energy and said she was cooking, cleaning, and engaging more.  Dr. Asher observed Plaintiff was less sad and anxious with a stable mood and no tears.  He recommended Plaintiff return in twelve weeks and continue with therapy and medication.  (Tr. 490).

Dr. Asher saw the claimant for the first follow-up since February in May 2019.  (Tr. 475).  Plaintiff reported her father recently passing and that she "watched him suffer for 10 minutes" before he died.  She reported feeling worse, with "so-so" sleep.  Dr. Asher observed a depressed mood with tears; appropriate dress and hygiene; normal speech; good eye contact; and alert and oriented.  (Tr. 476).  He recommended Plaintiff return in five to six weeks and continue with therapy and adjusted medication.  (Tr. 499).

In June 2019 Plaintiff was discharged from therapy as her "service objectives successfully [were] met."  (Tr. 377).  At her July 2019 follow-up with Dr. Asher, Plaintiff reported she implemented the medication increase from last time and was doing better since then.  (Tr. 461-62).  She stated that sometimes she feels more relaxed and better and other times very nervous and lacks focus and ability to function.  Dr. Asher observed her mental examination was mostly unchanged from last time but had less tears.  (Tr. 462).

### C.  Medical Opinions

1.  ***Dr. James Johnson***

In September 2018, Dr. James Johnson, a state agency expert, completed a consultative examination and found insufficient evidence prior to Plaintiff's last insured date to establish physical limitations.  (Tr. 55–56, 59).

2. *Dr. Steven Akeson*

In September 2018, Dr. Steven Akeson, a state agency psychological expert, completed a consultative examination and found insufficient evidence prior to Plaintiff's last insured date to establish mental limitations.  (Tr. 56–58).

3. *Dr. Jason Asher*

In October 2019, Dr. Jason Asher, Plaintiff's treating psychologist since June 2018, completed a mental evaluation of Plaintiff.  (Tr. 512–15).  Dr. Asher reported a current diagnosis of recurrent major depressive disorder.  He also listed several functional limitations Plaintiff suffered from due to her mental impairment as well as from anxiety related to traumatic experiences from the Bosnian war.  Dr. Asher did not know the onset date of these limitations but knew they were present beginning in June 2018.

Dr. Asher opined Plaintiff had moderate interreference concentrating at simple routine tasks and would perform work at a 31-percent below average pace of production.  He found Plaintiff had marked limitations understanding and learning terms, instructions, and procedures and moderate limitations following simple oral instructions and making work-related decisions. Dr. Asher further opined that Plaintiff suffered from marked limitations in her ability to function independently, work a full day without more than allotted rest periods, and sustain ordinary routine and regular attendance.  He estimated Plaintiff's psychological symptoms—fatigue, depressed mood, anxiety, crying spells, and lack of motivation—would disrupt a full work day or cause her to miss work three or more times a month.  Dr. Asher found Plaintiff had moderate limitations interacting with others and could perform in a task-oriented setting with only casual and infrequent contact with coworkers and the general public.

**III.**   **Standard of Review and Legal Framework**

To be eligible for disability benefits, Plaintiff must prove that she is disabled under the Social Security Act.  *Baker v. Sec'y of Health & Hum. Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d).  A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work" but also unable to "engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* at § 423(d)(2)(A).

The Social Security Administration has established a five-step sequential process for determining whether a claimant is disabled.   20 C.F.R. § 404.1520(a).   Steps 1–3 require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her disability meets or equals a listed impairment.  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); 20 C.F.R. §§ 404.1520(a)–(d).  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to Steps 4 and 5.  *Pate-Fires*, 564 F.3d at 942; *see also* 20 C.F.R. § 416.920(e).   At this point, the ALJ assesses the claimant's residual functioning capacity ("RFC"), "which is the most a claimant can do despite her limitations."  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009); 20 C.F.R. § 404.1545.  The Eighth Circuit has noted that the ALJ must determine a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations.  *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005).  At Step 4, the ALJ must determine whether the claimant can

return to her past relevant work by comparing the RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. § 404.1520(f).  If the ALJ finds at Step 4 that a claimant can return to past relevant work, the claimant is not disabled.  *Id.*

The court's role on judicial review is to decide whether the ALJ's determination is supported by "substantial evidence" on the record as a whole.  *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision.  *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).  Even if substantial evidence would have supported an opposite decision or the reviewing court might have reached a different conclusion had it been the finder of fact, the Court must affirm the Commissioner's decision if the record contains substantial evidence to support it.  *See McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome"); *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992) (explaining a court may not reverse merely because substantial evidence would have supported an opposite decision).  The Eighth Circuit has emphasized repeatedly that a court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010) (quoting *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001)).  Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence

in support of the Commissioner's decision," *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998),

and not merely a "rubber stamp."  *Cooper v. Sullivan*, 919 F.2d 1317, 1320 (8th Cir. 1990).

**IV.**   **The ALJ's Decision**

The ALJ's decision in this matter conforms to the five-step process outlined above.  At

Step 1, the ALJ found Plaintiff did not perform substantial gainful activity since January 31, 2017,

the alleged onset date.  (Tr. 13).  At Step 2, the ALJ found Plaintiff had severe impairments of

mild carpal tunnel syndrome status post release, partially ruptured Baker's cyst, and degenerative

disc disease of the cervical spine.  (Tr. 13).  At Step 3, however, the ALJ found Plaintiff did *not*

have an impairment or combination of impairments that met or medically equaled a statutorily

recognized impairment.  (Tr. 15).  The ALJ determined Plaintiff retained the RFC to perform the

full range of "medium" work, as defined by 20 C.F.R. § 404.1567(c).  (Tr. 15–20).  At Step 4, the

ALJ found Plaintiff was able to perform her past relevant work as a cleaner, a home healthcare

worker, and a packer.  (Tr. 20–21).  Consequently, the ALJ concluded Plaintiff is not disabled.

(Tr. 21).

**V.**   **Discussion**

Four specific issues exist between the parties in this case: (1) whether the ALJ properly

considered Plaintiff's treating psychiatrist's opinion, (2) whether the ALJ properly found

Plaintiff's mental impairments not severe, (3) whether the ALJ properly considered Plaintiff's

subjective complaints, and (4) whether the RFC is supported by substantial evidence.

**1.**  ***The ALJ Properly Discounted Dr. Asher's Medical Opinion***

Plaintiff argues that the ALJ improperly discounted the opinion of Plaintiff's treating

psychiatrist, Dr. Asher.  The ALJ found Dr. Asher's October 2019 opinion "unpersuasive" and

specifically noted that he "did not begin to treat [Plaintiff] until after the date last insured."[2]  (Tr. 20).  The Court agrees and finds it especially important that Dr. Asher first began treating Plaintiff in June 2018—at least two months *after* the insured date expired.  Thus, Dr. Asher's opinion— that Plaintiff suffers from significant functional limitations—relates to a period outside the relevant period, as Plaintiff was required to show she was disabled before or on March 31, 2018, the date her insured status expired.  *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984) (explaining claimant has the burden of establishing the existence of a disability on or before the expiration of her insured status).  Moreover, Dr. Asher did not "place" Plaintiff's alleged disabling limitations within the insured period.  *Id.* (holding an examining physician *after* the expiration of a claimant's insured status will be considered if the physician places the claimant's disabling problems within the insured period).  In fact, Dr. Asher specifically stated in his opinion that he did not know the onset date of Plaintiff's functional limitations.[3]  (Tr. 515).  Thus, the ALJ properly considered and discounted Dr. Asher's medical opinion.[4]

### 2.   *The ALJ Properly Found Plaintiff's Mental Impairments Not Severe*

Plaintiff argues the ALJ erred at Step 2 of the sequential analysis by finding her medically determinable mental impairments—generalized anxiety disorder, major depressive disorder, and PTSD—not severe.  A severe impairment is an impairment that significantly limits a claimant's ability to perform basic work activities without regard to age, education, or work experience.  *See* 20 C.F.R. §§ 404.1522, 404.1520(c).  The ALJ finds impairments not severe if the medical

---

[2] Also, of importance, Dr. Asher's opinion was written over 18 months *after* Plaintiff's insured status expired.  *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (affirming decision when ALJ gave treating physician opinion less deference because it was written three years after claimant's benefits expired).

[3] Dr. Asher also left blank the "duration of disability" section of the opinion, where it asks whether Plaintiff's limitations have lasted or can be expected to last twelve continuous months.

[4] The ALJ also found Dr. Asher's opinion unpersuasive because it was inconsistent with and unsupported by his own records and other medical records.  (Tr. 20).  As such, Plaintiff argues the ALJ's conclusion is not supported and that the ALJ failed to properly articulate the consistency and supportability factors.  Doc. [23] at 7–12.  Because the Court found the ALJ properly discounted Dr. Asher's opinion on a separate basis, the Court does not address this argument.

evidence establishes only a "slight abnormality" that would have "no more than a minimal effect" on an individual's ability to work. *Kirby v. Astrue*, 500 F.3d 705, 707–08 (8th Cir. 2007) ("An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."); *Nguyen v. Chater*, 75 F.3d 429, 431 (8th Cir. 1996) (explaining that no impairment is found at Step 2 if it has "no more than a minimal effect on the claimant's ability to work"). Plaintiff bears the burden of proving her impairment is severe. *Nguyen*, 75 F.3d at 430.

In accordance with the regulations, the ALJ rated the severity of Plaintiff's functional limitations by looking at four broad functional areas: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. §§ 416.920a(c)(3)–(4). The ALJ determined that Plaintiff had only "mild" limitations in the four areas of mental functioning.[5] (Tr. 14–15). The ALJ's "mild" rating generally means that Plaintiff's impairment is not severe. *See* 20 C.F.R. § 416.9200a(d)(1). While it is true Dr. Asher opined that Plaintiff had moderate to marked mental limitations, the ALJ properly discounted his opinion, as discussed *supra*.[6] Thus, the principal issue here is whether substantial evidence supports the ALJ's finding of no severe mental impairments. *Byes v. Astrue*, 687 F.3d 913, 916 (8th Cir. 2012). For reasons discussed below, the Court finds substantial evidence supports the ALJ's rating of "mild" limitations from Plaintiff's emotional and psychological problems.

In rating the severity of Plaintiff's mental limitations, the ALJ properly considered the "longitudinal picture" of Plaintiff's functional limitations during the relevant period. *See* 20 C.F.R.

---

[5] The ALJ acknowledged that Plaintiff suffers from mental impairments but that the record does not show they caused more than a minimal limitation in her ability to do basic work activities.

[6] Plaintiff argues that the ALJ discredited all medical evidence (*i.e.*: Dr. Asher's medical opinion) concerning Plaintiff's functional mental limitations before concluding she had no significant limitations relating to her mental capabilities. As the Court discussed *supra*, the ALJ properly discounted Dr. Asher's opinion. Thus, the principal issue here is whether substantial evidence supports the ALJ's finding of no severe mental impairments.

§ 416.920a(c).  During a majority of the relevant period, Plaintiff reported her depression was "not an issue for her," that she was "doing mentally well," and declined mental health referrals.  She denied feeling anxious, reported no sleep disturbances, no feelings of hopelessness, nor feeling down or depressed.  *Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011) (considering the claimant's own statements when determining the severity of a mental impairment).  Dr. Patel noted several times during the relevant period that Plaintiff's depression was "mild."  Dr. Patel also observed consistent "normal" examinations, where Plaintiff frequently demonstrated a normal mood, pleasant attitude, and appropriate behavior, appearance, and speech.  February 2017 PHQ-9 testing showed a score of 0 and results were that Plaintiff's mental impairments did not cause her difficulty in daily living.  Only until October 2017 did Plaintiff report mental health symptoms, such as anxiety and stress, and express an interest in beginning therapy.  Still, Dr. Patel observed no psychological symptoms, no sleep complaints, and normal mood and enjoyment of activities.  At a December 2017 mental health assessment, the provider observed normal mood, appropriate speech, above normal intelligence, appropriate thought process and content, pleasant attitude, well-groomed, no perceptual disturbances, despite a flat affect and low energy.  In March 2018, during Plaintiff's last insured month, Dr. Patel noted Plaintiff's depression was "stable" and reported a normal examination with normal mood, affect, and appearance.  The ALJ properly considered these medical records, including clinical signs and observations, from the relevant period when determining Plaintiff's mental impairments were not severe.  *See* 20 C.F.R. § 416.920a(c)(1) (rating the degree of functional mental impairments by considering longitudinal records of clinical signs).

The ALJ also properly considered the nature of Plaintiff's medical treatment prior to the expiration of her insured status.  *See id.* (rating the degree of functional mental impairments by

considering longitudinal records of treatment).  The ALJ discussed Plaintiff's minimal mental health treatment for a majority of the relevant period.  Until December 2017, Plaintiff's mental health treatment was limited to infrequent visits to Dr. Patel, her primary care doctor, for medication management.  *Kamann v. Colvin*, 721 F.3d 945, 950–51 (8th Cir. 2012) (noting that the ALJ properly considered that the claimant was seen "relatively infrequently for his impairments despite his allegations of disabling symptoms"); *see also Vanlue v. Astrue*, No. 4:11-cv-595-TIA, 2012 WL 4464797, at *12 (E.D. Mo. Sept. 26, 2012) (affirming the ALJ's finding that depression was not a severe impairment where the claimant had sought only minimal and conservative treatment and the claimant never required more aggressive forms of mental health treatment than medication).  The record shows this course of treatment significantly controlled her mental impairments until late 2017.  *Mabry v. Colvin*, 815 F.3d 386, 391–92 (8th Cir. 2016) (explaining an impairment controlled by medication is not considered disabling).  The ALJ also noted that prior to the expiration of her insured status, Plaintiff did not see a psychiatrist or psychologist, and despite alleging disabling mental impairments for a long time, Plaintiff did not seek treatment or counseling until October 2017.  *See Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (finding absence of evidence of ongoing counseling or psychiatric treatment disfavors finding of disability); *Kirby*, 500 F.3d at 708–09 (affirming ALJ's finding that claimant did not suffer significant impairment due to psychiatric illness when claimant had never had any formal treatment by psychiatrist, psychologist, or other mental health professional on a long-term basis); *Brandes v. Colvin*, No. 4:15-cv-01737-NCC, 2017 WL 168457, at *6 (E.D. Mo. Jan. 17, 2017) (affirming ALJ's finding that depression was not a severe impairment were claimant sought no formal psychological treatment).  Finally, the ALJ noted that, during the time in question, Plaintiff's treatment was limited to medication through her primary care doctor and then mental

health therapy beginning in December 2017, both of which are conservative forms of treatment. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (explaining the ALJ may consider a plaintiff's conservative course of treatment as indicative that his symptoms are not disabling).

Considering all of the objective and subjective evidence presented, as of the time Plaintiff last met her insured status, the ALJ properly found her mental impairments did not impose any significant limitations to performing basic work activities. *Kirby*, 500 F.3d at 707–08. Thus, the record includes substantial medical evidence that Plaintiff did not have severe mental impairments during the relevant period.

Plaintiff argues that records *after* the expiration of Plaintiff's insured status show the severity of her mental impairments. Although the record may indicate Plaintiff's mental health worsened *after* her insured status expired, such evidence is not indicative of Plaintiff's mental condition during the period relevant to his claim. *See Thomas v. Sullivan*, 928 F.2d 255, 260–61 (8th Cir. 1991) (explaining that a claimant's worsening condition, which deteriorated after the ALJ's decision, could not act as the basis of determining claimant's condition at the time he was eligible for benefits); *Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014) (explaining the ALJ need "only consider the applicant's medical condition as of his or her date last insured").

Nonetheless, the ALJ considered medical evidence *after* Plaintiff's insured date. While post-insured status records show Plaintiff's mental symptoms waxed and waned between appointments, she generally appeared alert, oriented, neatly groomed with normal speech, and a logical and goal-directed thought process. *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010) (appearing alert and oriented with normal speech and thought processes is inconsistent with claimant's allegations of disability). Most notably, the ALJ found that Plaintiff's mental impairments were controlled, or at least controllable, even after the relevant period. The ALJ

discussed, and substantial evidence supports, that Plaintiff's depression and anxiety improved with medication and her sleep issues improved shortly after beginning psychiatric treatment. If an impairment is adequately controlled by treatment or medication, it is not a disabling condition. *Mabry*, 815 F.3d at 391–92; *see also* 20 C.F.R. § 416.920a(c)(1) (assessing mental health functioning based on effects of medication).

Finally, Plaintiff argues that the ALJ improperly played doctor by interpreting the aforementioned medical records. The "interpretation of physicians' findings is a factual matter left to the ALJ's authority." *Mabry*, 815 F.3d at 391. With that said, the ALJ cannot "play doctor," meaning that "the ALJ cannot draw improper inferences from the record or substitute a doctor's opinion for his own." *Adamczyk v. Saul*, 817 F. App'x 287, 289 (8th Cir. 2020). The Court finds that the ALJ did not substitute its opinion for a doctor or make any improper inferences when determining Plaintiff's mental impairments were not severe; rather, the ALJ's interpretation of the physicians' findings is consistent with the various clinical findings and course of treatment shown in the record.

### 3. *The ALJ Properly Discounted Plaintiff's Subjective Complaints*

Plaintiff argues the ALJ improperly evaluated Plaintiff's subjective complaints by discounting her symptoms solely based on objective medical evidence. Indeed, the ALJ cannot discount Plaintiff's subjective complaints solely because they are unsupported by objective medical evidence. *Halverson*, 600 F.3d at 931–32 (citing *Mouser*, 545 F.3d at 638); *see also Wagner*, 499 F.3d at 851 ("The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints"). "Where objective evidence does not fully support the degree of severity in a claimant's subjective complaints of pain, the ALJ must consider all

19

evidence relevant to those complaints." *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).  This includes evidence pertaining to (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) any functional restrictions.  *See* 20 C.F.R. § 404.1529; *Polaski*, 739 F.2d at 1322.  The Court will defer to the ALJ's credibility determination if it is supported by good reasons and substantial evidence.  *Bryant v. Colvin*, 861 F.3d 779, 782–83 (8th Cir. 2017).

While the ALJ discounted Plaintiff's subjective complaints based on objective medical evidence, the ALJ also considered evidence of Plaintiff's minimal treatment prior to the expiration of her insured status, her conservative course of treatment, and evidence indicating her impairments improved with medication and both physical and mental therapy.  Thus, the ALJ considered evidence other than the lack of objective medical evidence when discounting Plaintiff's complaints.

Plaintiff next argues the ALJ failed to "connect the dots" and explain how those topics weighed against Plaintiff's credibility.  However, the ALJ is not required to specifically discuss each factor and how it relates to Plaintiff's credibility.  *See Partee*, 638 F.3d at 965 (stating that "[t]he ALJ is not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting a [plaintiff's] subjective complaints") (internal quotation and citation omitted); *Samons v. Astrue*, 497 F.3d 813, 820 (8th Cir. 2007) (stating that "we have not required the ALJ's decision to include a discussion of how every *Polaski* factor relates to the [plaintiff's] credibility.").

Rather, it was sufficient that the ALJ discussed Plaintiff's minimal and conservative medical treatment when discounting her complaints.  *See* 20 C.F.R. § 404.1529(c)(3)(v)

(explaining the agency considers the claimant's "treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of [the claimant's] pain or other symptoms" when evaluating symptoms); *Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (failing to seek treatment for a long time and conservative treatment weighs against credibility); *Chamberlain v. Shalala*, 47 F.3d 1489, 1495 (8th Cir. 1995) (failing to seek aggressive medical care is not suggestive of disabling pain).   Similarly, the ALJ properly noted the improvement of Plaintiff's impairments with medication and both mental and physical therapy when analyzing her credibility.  *See* 20 C.F.R. § 404.1529(c)(3)(iv) (explaining the agency considers the "effectiveness" of medication when evaluating symptoms); *Mabry*, 815 F.3d at 391–92 ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").   Further, the ALJ discussed Plaintiff's claims of disabling impairments inconsistent with the mostly "normal" objective mental status examinations and "unremarkable" physical examinations during the period at issue.  *Goff*, 421 F.3d at 792 (holding proper the ALJ's consideration of unremarkable or mild objective medical findings as one factor in assessing credibility of subjective complaints).  Finally, the ALJ discussed inconsistencies between Plaintiff's alleged extreme symptoms and her consistent normal clinical findings.  *Adamczyk*, 817 F. App'x at 291 (discounting a claimant's subjective statements, in part, based on consistent medical reports noting well-groomed, clear speech, linear thought process, cognition and memory intact, and ability to follow and engage in appropriate conversation); *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008) (deferring to the ALJ's credibility determination where the objective medical evidence did not support the claimant's testimony as to the depth and severity of his physical impairments).

Therefore, the Court concludes the ALJ adequately, if not expressly, applied the *Polaski* factors and properly discounted Plaintiff's subjective complaints of limitation, pain, and severity.

4.  ***The ALJ Determined the RFC Based on Substantial Evidence***

a.  <u>The ALJ Based the RFC on "Some" Medical Evidence</u>

First, Plaintiff contends the ALJ did not support the RFC with sufficient medical evidence. "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Cox*, 495 F.3d at 619.  Although the record contains medical evidence generally, Plaintiff argues the record was insufficient to assess her RFC because the record does not contain an *opinion* from a medical source addressing her physical limitations.  However, RFC's do not require medical opinions.  *See, e.g.*, *Stringer v. Berryhill*, 700 F. App'x 566, 567–68 (8th Cir. 2017) (affirming RFC without medical opinion evidence); *Myers v. Colvin*, 721 F.3d 521, 526–27 (8th Cir. 2013) (same); *Perks v. Astrue*, 687 F.3d 1086, 1092–93 (8th Cir. 2012) (same); *see also Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) ("There is no requirement that an RFC finding be supported by a specific medical opinion."); *Cox*, 495 F.3d at 619 (noting a medical opinion is not necessary to assess a claimant's RFC).  Rather, the RFC requires "some medical evidence" of Plaintiff's ability to function in the workplace, such as medical records and observations of treating physicians.  *See Hensley*, 829 F.3d at 932 (holding physicians medical records is sufficient medical evidence for RFC purposes); *see also* 20 C.F.R. § 404.1545(a)(3) (considering "descriptions and observations" of a claimant's limitations from an impairment as evidence to support RFC).  "Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the [ALJ]." *Cox*, 495 F.3d at 619–20.

Here, because the ALJ did not rely on any medical opinions relating to functional capacity while determining Plaintiff's RFC, the main issue is whether the record as a whole contains

substantial evidence—including medical evidence addressing Plaintiff's ability to function in the workplace—that supports the RFC.  The Court answers this question in the affirmative.

To support the RFC determination, the ALJ looked at the numerous normal and unremarkable findings in the record observed by Plaintiff's treating physicians.  "In the absence of medical opinion evidence, medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings." *Hensley*, 829 F.3d at 932 (quoting *Johnson v. Astrue*, 628 F.3d 991, 995 (8th Cir. 2011) (internal quotations omitted)); *see also Flynn v. Astrue*, 513 F.3d 788, 793 (8th Cir. 2008) (upholding RFC based on physician's reports and findings).

As to Plaintiff's physical impairments, Dr. Patel observed numerous "normal" physical examinations during the relevant period, including normal muscle strength, range of motion, and gait.  A March 2018 x-ray of Plaintiff's shoulder was normal.  During Plaintiff's last insured month, Dr. Patel noted normal neck, musculoskeletal, and neurological examinations and no musculoskeletal or neurological symptoms.  Even shortly after the relevant period, and despite being officially diagnosed with carpal tunnel syndrome, physicians' observed Plaintiff had full upper extremity strength, normal mobility, and no deficits.  *Flynn*, 513 F.3d at 793 (affirming RFC based on physician's observations of normal muscle strength, good mobility, and full muscle strength).  In April 2018, *after* the last insured date, Dr. Patel observed no muscle wasting and intact range of motion in Plaintiff's right hand.  An October 2018 examination showed normal motor strength in all upper extremities and normal range of motion in the shoulder and cervical spine.  Thus, the record includes substantial medical evidence addressing Plaintiff's physical ability to function.

b.  <u>The ALJ Based the RFC on a Developed and Informed Record</u>

Next, Plaintiff argues that the lack of medical evidence to support the RFC—as discussed *supra*—shows that the ALJ failed to develop the record.  Indeed, the ALJ has an independent duty to fully and fairly develop the record in a social security disability case.  *Snead v. Barnhart*, 360 F.3d 834, 836–37 (8th Cir. 2004).  This duty includes ensuring the record contains evidence from a treating physician addressing the particular impairments at issue.  *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004).  In this case, the ALJ properly developed the record by collecting Plaintiff's medical records, and as discussed *supra*, there is substantial physical and psychological medical evidence in the record from her treating physicians.  Indeed, Plaintiff does not argue the ALJ failed to review or gather any of the evidence from the relevant period or even thereafter.  *See Cox v. Apfel*, 160 F.3d 1203, 1209 (8th Cir. 1998) (finding that the ALJ failed to develop the record by not gathering "records for the seventeen months prior to the hearing").  The ALJ also did not find any physician's records inadequate, unclear, or incomplete, nor did it find any physician used unacceptable clinical and laboratory techniques.  *Stormo*, 377 F.3d at 806 (requiring the ALJ "to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped").

The ALJ sought to further develop the record by providing two consultative medical examinations.  These examiners found insufficient evidence prior to Plaintiff's last insured date to establish any limitations.  Despite these opinions, the ALJ made an informed decision based on substantial medical evidence from treating physicians in the record.  *See Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001) (finding ALJ did not err in not requiring another consultative examination because there was "substantial evidence in the record to allow the ALJ to make an informed decision"); *see also Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir. 2000) (holding that it

is reversible error for an ALJ to fail to order a consultative examination if one is necessary to make an informed decision).

Although the medical evidence in this case *during the relevant period* is admittedly scant, this is not because the ALJ failed to develop the record nor does it show the record was underdeveloped.  Rather, the ALJ developed the record and made an informed decision that the record evidence revealed no impairment that limited Plaintiff's ability to function in the workplace beyond medium work during the relevant period.

c.   The ALJ's RFC Finding of "Medium Work" Is Supported by Substantial Evidence

Finally, Plaintiff argues the RFC includes no limitations for lifting, handling, fingering, or feeling to account for her symptoms of carpal tunnel.  The ALJ concluded that Plaintiff has the RFC to perform "medium work," without limitations, which means she can lift no more than fifty pounds at a time with frequent lifting or carrying of objects weighing twenty-five pounds.  *See* 20 C.F.R. § 404.1567(c).  As the Court discussed *supra*, medical evidence during and immediately after the period in question showed that Plaintiff retained full strength and range of motion in all upper extremities with no deficits.  *Flynn*, 513 F.3d at 793 (finding observations from doctors of normal and full muscle strength and good mobility supports RFC's weight ability).  Specifically, Dr. Patel noted no muscle wasting and intact range of motion in Plaintiff's right hand in April 2018, and several other examinations noted normal neurological examinations and no musculoskeletal or neurological symptoms.  As late as seven months post-insured date, Plaintiff reported no difficulties buttoning or picking up small objects, and a physician observed normal motor strength throughout her upper extremities.  The evidence during the relevant period that detracts from the ALJ's RFC assessment is evidence of Plaintiff's subjective complaints.  As discussed *supra*, the ALJ engaged in a proper credibility analysis and then "properly limited [the]

RFC determination to only the impairments and limitations [the ALJ] found credible based on [] evaluation of the entire record."  *McGeorge v. Barnhart*, 321 F.3d 766, 769 (8th Cir. 2003); *see also Goff*, 421 F.3d at 793 (explaining the RFC is based on all "credible evidence").  As such, the ALJ found, and substantial evidence supports, that evidence from the relevant period does not support physical limitations beyond medium work.

Plaintiff suggests that Plaintiff's post-insured diagnosis of carpal tunnel necessities limitations in the RFC.  Although the ALJ typically must "only consider the applicant's medical condition as of his or her date last insured," *Turpin*, 750 F.3d at 993, evidence from outside the insured period can be used in "helping to elucidate a medical condition during the time for which benefits might be rewarded."  *Cox*, 471 F.3d at 907; *see also Basinger*, 725 F.2d at 1169 ("If the diagnosis is based upon a 'medically accepted clinical diagnostic technique,' then it must be considered in light of the entire record to determine whether 'it establishes the existence of a 'physical impairment' prior to' the expiration of the claimant's insured status.").  Accordingly, the ALJ considered Plaintiff's diagnosis of carpal tunnel *after* the expiration of her insured status to mean that carpal tunnel was present during the relevant period[7]; as such, the ALJ determined Plaintiff's carpal tunnel syndrome was a severe impairment during the relevant period.

However, Plaintiff's later diagnosis does not "bear upon the severity" of her condition *before* the expiration of her insured status.  *Basinger*, 725 F.2d at 1169 ("Medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status.").  In other words, the later diagnosis confirms that Plaintiff experienced symptoms related to carpal tunnel prior to the expiration of her insured status, but

---

[7] The ALJ specifically noted that it looked at records after Plaintiff's insured status expired to see if any impairment was related to or had its genesis prior to the date last insured.  (Tr. 17).

Plaintiff's post-insured diagnosis does not negate the ALJ's finding that record evidence prior to the diagnoses (during the relevant period) did not support including greater limitations into the RFC.  During the time in question, the ALJ properly found, based on medical and other evidence, that Plaintiff retained the ability to perform medium work and Plaintiff provides no credible evidence to the contrary.  20 C.F.R. § 404.1545(a)(3) (stating a claimant is "responsible for providing the evidence [the ALJ] will use to make a finding" about the RFC).  And, that her impairment may have deteriorated *after*[8] the relevant period does not demonstrate limitations or disability during the period relevant to Plaintiff's claim.  *See Thomas*, 928 F.2d at 260–61.  Because the RFC need only include the limitations supported by the record, *Tindell v. Barnhart*, 444 F.3d 1002, 1007 (8th Cir. 2006), and the record during the relevant period shows carpal tunnel did limit Plaintiff's ability to perform medium work, the ALJ's RFC is supported by substantial evidence.

It is also worth mentioning that even if Plaintiff was "disabled" from carpal tunnel on March 31, 2018, there is substantial evidence that she could not meet the duration requirement. *See* 42 U.S.C. §§ 423(d), 416(i)(1)(A).   Under the regulations, a "disability" requires the impairment to last 12 months and also be severe enough to prevent the claimant from engaging in virtually any "substantial gainful work."  *See* 42 U.S.C. § 423(d); *see also Barnhart v. Walton*, 535 U.S. 212 (2002) (upholding the Commissioner's interpretation of 42 U.S.C. § 423(d) to require that the disability, and not only the impairment, must have existed or be expected to exist for 12 months).  Plaintiff has the burden of establishing the existence of a disability on or before the expiration of her insured status.  *Basinger*, 725 F.2d at 1169.  The ALJ found, and Plaintiff does not dispute, that her last insured date was March 31, 2018.

---

[8] Some examinations post-insured date show decreased strength and range of motion, and Plaintiff sometimes reported difficulty holding or grasping items.

27

It follows then, that to be disabled, Plaintiff must have suffered from carpal tunnel *and* the symptoms must have been so severe as to preclude her from work by March 31, 2018.  Thus, even if the record demonstrates Plaintiff suffered from carpal tunnel for a year or more prior to the expiration of her insured status, record evidence does *not* establish that her carpal tunnel was so severe that her symptoms caused much, if any, functional limitations prior to or on March 31, 2018.  It is not sufficient for Plaintiff to establish that her *impairment* had its roots before the date that her insured status expired.  Rather, she must show that her impairment reached a *disabling level of severity* by that date, and the ALJ's conclusion that her carpal tunnel was not disabling by March 31, 2018 is supported by substantial evidence.

After considering all of the evidence in the record, both evidence that supports the ALJ's decision and detracts from the ALJ's decision, see *Cox*, 495 F.3d at 617, the Court finds that substantial evidence supports the ALJ's decision.

## CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 1st day of March 2022

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE